FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Sep 26, 2018

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

JOSE LUIS SANCHEZ, JR,

                Petitioner,

    v.

DONALD HOLBROOK,

                Respondent.

1:17-cv-03196-SAB

**ORDER DENYING PETITION UNDER 28 U.S.C. § 2254**

Before the Court is Petitioner's Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus By a Person in State Custody, ECF No. 1. Petitioner is proceeding pro se. Defendant is represented by Assistant Attorney General John J. Samson.

Petitioner challenges his Yakima County jury conviction for aggravated first degree murder (2 counts), attempted first degree murder (2 counts), first degree robbery, first degree burglary, and first degree unlawful possession of a firearm.[1] He was sentenced in 2008 to life without the possibility of parole.

As grounds for federal habeas relief, Petitioner asserts: (1) denial of his Sixth Amendment right to the assistance of counsel; (2) denial of his right to effective assistance of counsel during an in-chambers discussion; (3) violation of

---

[1] After the jury trial, a bench trial was conducted on Count 7 – First Degree Unlawful Possession of a Firearm.

**ORDER DENYING PETITION UNDER 28 U.S.C. § 2254 ~ 1**

his right to a public trial during a closed proceeding on appointment of new counsel; (4) denial of due process in the admission of a witness's identification; (5) violation of his Sixth and Fourteenth Amendment rights when his motion to transfer venue from "jail courtroom" to regular courtroom was denied; (6) violation of the Fourteenth Amendment when the trial court denied a motion to suppress; (7) denial of effective assistance of counsel due to counsel's failure to move to suppress evidence; (8) insufficiency of the evidence; (9) denial of his Sixth Amendment right to present a defense and issue a jury instruction; (10) trial court erred in admitting evidence regarding a handgun; (11) trial court erred in admitting evidence of post-arrest conduct; (12) constructive denial of counsel due to a conflict of interest; and (13) ineffective assistance of counsel due to counsel's failure to object to Petitioner's arraignment being filmed by the media when eyewitness identification was an issue in the case.

## Facts

The Washington Court of Appeals summarized the facts underlying Petitioner's conviction as follows[2]:

> On the night of February 20, 2005, Michelle Kubric left her townhouse apartment to run an errand. Upon backing her Chevrolet Suburban out of its parking spot she was confronted by a Hispanic man with a gun, later established to be Mario Mendez, who appeared in front of the vehicle, illuminated by her headlights. A second Hispanic man, later established to be the appellant, Jose Luis Sanchez Jr., opened the driver's door, grabbed her by the hair, and pulled her from the vehicle. Holding a gun to her head, he walked her back to the apartment where she lived with Ricky Causor, a drug dealer, and their two daughters. He told her to tell Causor to open the door. When Causor opened the door, the man holding her hostage pointed his gun at Causor. She noticed the gun was square-shaped with its ammunition clip inserted from the bottom. She tried to wrestle the gun away but Causor said to stop, they were going to "give them what they want." He let the man enter. Once inside, the gunman forced

---

[2] *State v. Sanchez*, 171 Wash. App. 518 (2013).

Kublic to kneel on the floor with her and Causor's 3-year-old and 18-month-old daughters.

The man she had first seen in her headlights (Mendez) soon entered the apartment, now wearing a mask. He carried a revolver-style handgun and guarded her in the living room while the unmasked intruder took Causor into the kitchen to gather marijuana and money. After Causor retrieved all of his marijuana and approximately $900 in currency, the unmasked intruder escorted him back to the living room and Causor knelt down facing Kublic. Their daughters were on the floor between them. The unmasked intruder's last act before leaving the apartment was to fire five shots from his .45 caliber handgun at the heads of Causor and Kublic, at close range. Causor was struck by three shots, two of which passed through his body into the 3-year-old; both died almost immediately. The unmasked intruder's remaining shots wounded Kublic, who was hospitalized for a week with gunshot wounds to her neck, jaw, scapula, lung, and chest. They also injured the 18-month-old.

Officer David Cortez of the Yakima Police Department attempted to interview Kublic in the hospital intensive care unit the following morning. She was medicated, was in obvious pain, appeared tired, and was slow to give answers. She told him the attackers were two Mexican men who she believed arrived in an older full-size light-blue pickup that she noticed when walking out to her car the prior evening. Although Kublic would later describe the two gunmen and their roles differently, Officer Cortez's notes indicate that she told him the first had a wide nose and a lighter complexion and bigger build than the second, and that he wore a mask. She said the second gunman did not wear a mask, had a "sucked in" face, was thinner than the first, was small (she estimated about 5 feet 4 inches or 5 feet 5 inches tall), and was dingy looking with uncombed matted hair. She said the second had forced her from her vehicle and made her walk back to her apartment with a semiautomatic pistol to her head. He was the one who later shot Causor. She said Causor had taken the first gunman to another part of the apartment to give him what he wanted while she and the children stayed with the second.

The next morning, February 22, Detective David Kellett, the lead investigator for the department, visited Kublic in the hospital, hoping with her assistance to create composite images of the gunmen. Kublic looked sleepy and under the influence of medication, but was able to participate for about 45 minutes until pain and discomfort made her too tired to continue. In providing descriptions to the

detective, Kublic initially did not differentiate between the two gunmen except to state that one wore a mask and one did not. She told the detective she did not get as good a look at the one with the mask, but remembered well the face of the person who wore no mask.

Detective Kellett then enlisted her assistance in preparing a computer-generated composite of the gunman she remembered best. Kublic described him as thin and gaunt, with long and unkempt straight hair, a thin or short mustache, and a dark Hispanic complexion. Detective Kellett never asked her whether he, or the other, was the shooter. When she reached the point at which she was in too much pain to continue, she told him the depiction was good so far, but that the cheeks needed to be more hollow, the chin different and the hair longer.

On the night of February 22, Officer Cortez returned to the hospital and showed Kublic a photomontage. Before allowing Kublic to view this and later photo arrays, he admonished her that she was not required or expected to choose anyone but just to pick the person who did the crime, and that the purpose of the review is not only to arrested offenders but to clear the innocent. The photo array presented by Cortez happened to include Jose Luis Sanchez Jr., but only as a filler photo because he was not yet a suspect. Kublic did not identify him or anyone else from the array.

On February 23, police officers received two anonymous telephone tips that Jose Sanchez, or "Junior" Sanchez, a name by which he was commonly known, was responsible for the Causor murder. The second caller said that Junior could be found at 303 South Ninth Street. The Ninth Street address was the home of Luz Carrillo, her husband Albert Vasquez, and Luz Carrillo's three children. The oldest of Carrillo's children, Roberta, then age 15, was the girlfriend of Junior Sanchez and was pregnant with his child in February, 2005. The house was described by witnesses as a "drug house," known to be a place where acquaintances of the Vasquez/Carrillo family could drop in to smoke marijuana or crystal methamphetamine. Among those identified by witnesses as regulars at the Ninth Street house were Junior's older brother Manuel "Puppet" Sanchez and his younger brother Rene Sanchez. In February 2005, Junior was living with Roberta at the Ninth Street house.

Acting on the tips, officers set up surveillance and eventually stopped a Toyota Celica that left the hosue with Ramon Marmelejo driving and Junior in the passenger seat. Both were handcuffed and transported to the police station. While in a holding cell, Junior was

captured by a surveillance camera pulling currency from his pocket (as best he could while handcuffed) and attempting to eat it.

Back at the Ninth Street house, a frightened Albert Vasquez spontaneously had told an officer that his family needed protection because "the people who killed the little girl" had been at his house. He also told the officer that they left clothing inside. Officers obtained a search warrant for the house and seized the clothing worn by Junior on the day of the crime. They also found and seized a .45 Kimber handgun hidden within a couch, which proved in later ballistics testing to be the gun from which all the shell casings and bullets recovered from the murder scene were fired.

Detective Kellett returned to the hospital again late on the night of February 23 to present Kublic with a binder including a 20-page serial array of individual photographs. Among them were photographs of Junior Sanchez, Mario Mendez, and Manuel Sanchez. The detective did not tell her that Junior Sanchez had been arrested. Kublic appeared more alert. Detective Kellett positioned himself beside her and turned the pages, pausing about three seconds with each page. Upon seeing Mendez's photo, Kublic gasped and said, "that looks like him." She did not react in any way upon seeing the photographs of Junior Sanchez or Manuel Sanchez. After reviewing all of the photographs, Kublic took the book from the detective's hands, turned back to the photo of Mendez and expressed assurance that he was "the one without the mask."

On February 28, Mendez and Sanchez were charged as codefendants with several crimes including aggravated first degree murder, which carried a possible death penalty.

On March 2, several days after Kublic was released from the hospital, she met with Detective Kellett to provide a tape-recorded statement. By that time, Junior's booking photo had appeared in the newspaper and on local television news. In the course of Kublic's recorded statement, she stated that she now thought the suspect she had earlier described as having very short hair might have been the one with the automatic gun. She also stated that he had hair, "but after I saw him on the news, he's the one with the shaved head, the one that they have." Detective Kellett's understanding was that Kublic had been sure on February 23 that Mendez was the one without the mask, but on March 2 was now sure that "the one that they have" (Junior) was the one without the mask.

Mendez became aware within days that he was a suspect. After lying low in Yakima for six weeks, he fled to Mexico in April. He was

apprehended attempting to re-enter the United States in October 2005. He would later testify that he had learned Junior was accusing him of being the shooter and was sure the police would find his cell phone, which he had dropped during the crime. Knowing he would be caught eventually, he decided to return to Washington to face the charges.

By the time Mendez was arrested at the border, Jacqueline Walsh and Steven Witchley had been appointed to represent Sanchez. Their appointment was delayed due in part to a conflict of interest that prevented the Yakima County Department of Assigned Counsel (DAC) from representing either Junior or Mendez. When DAC director L. Daniel Fessler learned of Mendez's California arrest on October 25, he began to look for qualified counsel outside his office to represent Mendez. On November 7, a Yakima County judge signed an order authorizing counsel for Mendez at public expense. On November 9, Mendez's illegal immigration charges were dismissed and he was transferred to the Yakima County Jail. Mendez appeared for arraignment on November 17. Counsel was appointed for him on November 18.

By this time, however, Junior's lawyers had already interviewed Mendez three times. Upon being apprehended at the border, Mendez was initially held in a corrections center in San Diego. Attorney Norma Aguilar was appointed to represent him in connection with the immigration charge. She and representatives of the Mexican Consulate told Mendez not to discuss the Yakima County criminal charges pending against him with anyone but the lawyers who would be appointed to represent him in that case.

Nonetheless, on November 3, Mendez spoke with Witchley and his investigator Larry Freeman, who had traveled to the detention center in San Diego to interview Mendez about the Yakima crimes. Witchley and Freeman interviewed Mendez about the Yakima charges a second time in San Diego on November 4. During both meetings, Freeman took notes and prepared detailed interview summaries. On November 16, after Mendez's transfer to Yakima, but before he had been arraigned or appointed counsel, Witchley and Freeman visited Mendez a third time, this time in the jail, again questioning him about the pending charges. Freeman again took notes and prepared an interview summary.

The interviews would give rise to a motion to disqualify Witchley and Walsh. An additional basis for the motion was that in December 2005, Roberta Carrillo, her younger sister, AC, then age 15 and her younger brother, RC, then age 12, were flown at Witchley's

and Walsh's expense to Stockton, California, to live with their father, Ramiro Carrillo Sr., without the permission of their mother. Carrillo was the children's legal custodian even though they had been living with their mother in Yakima. Witchley and Walsh later asserted that they moved the children solely for humanitarian reasons because they were living in squalor and dangerous conditions in Yakima. They never sought reimbursement of the children's airfare. Before flying the children out of state, Witchley and Walsh did not contact Child Protective Services or other agencies that could have helped the children, nor did they inform the police or prosecutor that they were sending the children away from Yakima.

In early January 2006, Detective Kellett and Detective Uriel Mendoza learned that the Carrillo children were in California and flew there to locate them and obtain statements about what they knew about the crimes. Two of the children had personal knowledge of material information inculpating Junior. RC had earlier told police that Junior Sanchez was carrying the .45 caliber murder weapon on the day of the murders. Roberta had earlier admitted seeing Junior return to the Ninth Street house with the murder weapon the night of February 20 and being given the gun for safekeeping by Junior the following day.

In September 2006, Mendez's lawyers filed a motion for sanctions against Witchley and Walsh for alleged violations of the Rules of Professional Conduct, including lawyer-witness conflict, stemming from their contact with Mendez and their arranging for the Carrillo children to leave the state. They asked that the two lawyers be disqualified as Junior's counsel, as well as for other sanctions.

The State did not join in Mendez's motion for sanctions but advised the court in a response pleading that it had concerns about the allegations of the defense lawyers' conduct. It informed the court that it might investigate criminal charges against Witchley and Walsh for witness tampering and intimidating a public servant.

The court conducted a hearing on the sanctions motion on November 17, 2006. It concluded that Mendez's motion and the State's response raised sufficiently serious prospects of future lawyer-witness and conflict problems that disqualification of Witchley and Walsh was necessary. A motion for reconsideration of the disqualification decision was denied.

New lawyers were appointed for Sanchez by no later than February 8, 2007. To accommodate the new defense lawyers, trial was continued from April to November 2007.

In August 2007, Sanchez moved to suppress Kublic's eyewitness identification of him as induced by impermissibly suggestive police procedures likely to lead to misidentification. He argued that her identification was too unreliable to be submitted to the jury. Kublic would eventually testify that her initial confusion about whether the shooter had been the man with or without the mask passed as she recovered from the trauma of the shooting, and that she was 100 percent sure that Sanchez was the gunman. She would testify at trial that just before he began shooting, she "saw his face clear as day, mad and pointing the gun." The court denied the suppression motion, concluding that Kublic's in-court identification would appropriately be tested on cross-examination and its reliability was a matter for the jury to decide.

In September 2007, Mendez pleaded guilty to murder, burglary, robbery, and assault charges in exchange for truthful trial testimony and a recommended 30–year sentence.

In October 2007, Sanchez filed a motion objecting to the court's scheduling of his trial in a courtroom in the Yakima County jail, rather than in the county courthouse. His motion to hold trial in the county courthouse was considered by the trial court at an evidentiary hearing in late October and denied.

A four-and-a-half-week trial began on November 5, 2007. Among the witnesses at trial were Mendez and Carlos Orozco Jr., both regulars at the Ninth Street house. They testified to having been present for discussions of a plan to rob Ricky Causor, who was believed to have a great deal of cash from selling marijuana and to be an easy target because he had not retaliated for a past robbery. The discussions included Junior, Mendez, Orozco, Ramon Marmelejo, Filiberto "Ben Davis" Montes, and Junior's brothers Manuel and Rene.

Mendez testified that on the morning of the crime, he traveled to the Ninth Street house to further discuss the robbery with Orozco and Junior. Mendez, Junior, and Rene decided to delay the robbery until later that evening. Early in the evening, Mendez and Junior left in Junior's blue pickup to buy beer and on the way dropped Mendez's car off at the apartment of Junior's second girl friend, Sarah Day. According to Mendez, Junior did not go inside the Day apartment. Mendez recalled there were three guns in Junior's truck at that time— Mendez's .38, Junior's .45, and a 9 mm for Rene—as well as ski masks that Mendez had prepared to serve as disguises. After buying beer, Junior decided they should drive by Causor's apartment to check

it out. He parked in a tight spot on a far end of the apartment's parking lot.

While Mendez and Junior sat in the truck drinking a beer, Kublic emerged from her apartment and entered her Suburban. According to Mendez, Junior said, "[T]his is the time" and both men jumped out of the truck and positioned themselves to block the Suburban when Kublic completed backing out of her parking spot. They wore hoods over their heads but no masks; Junior earlier told Mendez he would not wear a mask and never did. Mendez testified that Junior pulled Kublic from the vehicle, pointed a gun at her head, and threatened to kill her if she ran. Junior told Mendez to park the Suburban, which Mendez did, at the end of the parking lot. Mendez then hurried to Junior's truck, put on a mask, and joined Junior inside the apartment.

Kublic was by then kneeling on the living room floor, holding her girls. Causor emerged from the kitchen carrying bags of marijuana as Junior held a gun to his head. Causor set four bags of marijuana on a coffee table and pulled money from his pocket and threw it on the floor. Mendez and Junior each picked up a couple of bags of marijuana and stuffed currency in their pockets. Thinking everything was done, Mendez started to leave. But Junior then stepped behind Causor, who by then was kneeling on the floor, hugging Kublic. Junior shot Causor in the back of the head. Junior fired several shots at Kublic as Mendez fled outside.

Mendez ran for the Suburban but had misplaced the keys. He noticed a car that had apparently just pulled into the parking lot and had its headlights on, pointed in the direction of the Suburban. Mendez tried to hide behind the Suburban, certain that whoever was in the car could see him. Meanwhile, Junior had left the apartment and was making his escape in the truck. Upon hearing the truck and seeing it approach, Mendez stepped out and Junior stopped, allowing Mendez to jump in.

Mendez testified that they drove to Junior's uncle's house in Toppenish. Mendez soon realized that he had dropped his cell phone and wanted to go back, but Junior refused. At Junior's uncle's house they divided the marijuana and the cash. Junior traded his share of the marijuana to his uncle for "ice" (methamphetamine). Junior also tried to return the .45 to his uncle, to whom it actually belonged, but according to Mendez, the uncle—who had been told that the robbery "went wrong" and people had been killed—did not want it. According to Mendez, the uncle told Junior, "Sell it or get rid of it. Don't get

caught with it because you're going to get booked." Upon leaving the uncle's home, Junior dropped Mendez off at his house in Toppenish.

Carlos Orozco testified that Junior had pressed the others to commit the robbery and invited him to participate. He ultimately withdrew from the robbery plan for fear that Causor, from whom he regularly bought drugs, would recognize him. He testified that he was at the Ninth Street house on the evening of February 20 and learned about the shooting after the fact that night, from someone who saw it on the news. He and Ramon Marmelejo, who was also present at the Ninth Street house, drove by the Causor apartment to see what was going on and saw police cars and ambulances; Orozco noticed on leaving the Ninth Street house that Junior's blue pickup was gone. Orozco testified that when Junior returned to the Ninth Street house a couple of hours later, he was carrying a bag of "ice" in addition to some snacks. The next day, Orozco accompanied Junior and Roberta on a meth-selling trip to Wenatchee. According to Orozco, Junior still had his .45 handgun with him.

Roberta Carrillo offered testimony that was largely supportive of Junior. Junior's defense theory proposed that Manuel—who had been driven to Mexico by his sister in 2005 after she learned that Yakima police were looking for him and whose whereabouts were unknown—was the shooter, and Roberta testified that Manuel was an enthusiastic participant in plans for the robbery. She offered less helpful testimony as well, testifying that she and Junior owned two guns that they carried—a "nine" and a ".45"—although she testified that Orozco had access to the .45. She also testified that she and Junior spent the night of February 21 at a motel at his suggestion and that he allowed her at about that time to give his .45 handgun to her parents for protection.

The State presented other witnesses who supported the fact that Junior owned and carried the Kimber .45 handgun used in the murders. It called the security guard that Mendez and Junior encountered in the apartment parking lot shortly before the murders, who testified to speaking briefly with two Hispanic males on the night of February 20 and described the older, full-size, two-tone blue pickup truck in which they were parked. The State called the visitor to the apartment complex whose headlights were shining in the direction of the Suburban when Mendez fled the apartment; she testified that she was frightened at seeing an apparent robber, carrying a gun and bag and wearing what appeared to be a bandana on his face, who she then

saw picked up and driven from the parking lot in a large, old, blue pickup.

For its part, the defense characterized this as "a classic case[ ] of misidentification." It presented evidence that Junior was at the home of his second girl friend, Sarah Day, at the time of the crime. It vigorously challenged the reliability of Kublic's eyewitness identification by cross-examination and through the testimony of its expert, Dr. Robert Shomer. It pointed to the absence of any forensic evidence tying Junior to the crime scene despite the fact that the State recovered the clothing he was wearing on the night of the robbery; it presented the testimony of a defense expert that given the close range at which the family members were shot, there should have been traces of blood spatter on the shooter's clothing. It presented evidence raising doubt that Junior's truck could have been the vehicle that moved in and out of the small, tight parking lot to the apartment given problems with its power steering and the noise created by its glass-packed mufflers—noise that no witness had noted. It presented evidence that Junior allowed others access to the .45 and to his blue pickup. It maintained that someone else—most likely Manuel—was the actual killer. It argued that Junior was falsely accused by Mendez, who stood only to gain from his guilty plea and testimony against Junior.

The jury rejected the defense theory and found Junior Sanchez guilty as charged on all counts, all while armed with a firearm. In a bench trial that followed, he was found guilty of first degree unlawful possession of a firearm.

*Sanchez*, 171 Wash. App. at 527-539 (citations omitted).

## Procedural History

Petitioner sought interlocutory discretionary review of the superior court's order disqualifying his appointed defense counsel; appealed his conviction; and filed a personal restraint petition in the Washington state courts.

### (1)  Interlocutory Discretionary Review

Petitioner sought interlocutory discretionary review of the superior court's order disqualifying his appointed defense counsel with the Washington Court of Appeals on January 11, 2007. ECF No. 15, Ex. 3. The Commissioner of the

Washington Court of Appeals denied discretionary review on March 14, 2007. ECF No. 15, Ex. 8. Petitioner sought reconsideration of that ruling and the Washington Court of Appeals denied the Motion to Modify on July 31, 2007. ECF No. 15, Ex. 10. Petitioner sought review by the Washington Supreme Court on August 16, 2007, ECF No. 15, Ex. 11, which denied review on September 28, 2007. ECF No. 15, Ex. 12. Petitioner's Motion to Modify was also denied. ECF No. 15, Ex. 14. A certificate of finality was issued on December 31, 2007. ECF No. 15, Ex. 15.

**(2)     Appeal of Conviction**

Petitioner appealed his conviction and sentence to the Washington Court of Appeals on January 23, 2009. ECF No. 15, Ex. 16. He was represented by Susan F. Wilk. He presented the following Assignments of Error:

1.      The trial court erred in disqualifying his counsel under RPC 3.7 and RPC 1.8(e).

2.      The order disqualifying counsel violated his Sixth Amendment right to the assistance of counsel and impermissibly intruded into his protected attorney-client relationship.

3.      The disqualification of Petitioner's appointed counsel over his objection and that of his counsel violated his Fourteenth Amendment right to equal protection and article I, section 12, of the Washington Constitution, the privileges and immunities clause.

4.      The trial court denied Petitioner his Sixth Amendment right to be present at a critical stage of the proceedings when it excluded him from an in-chambers discussion regarding the status of his appointment of new counsel.

5.      The trial court violated the right to a public trial provided by the Sixth Amendment and article I, sections 10 and 22 of the Washington constitution when it held a closed proceeding on the appointment of

Petitioner's new counsel.

6.     The trial court erred in admitting witness Michelle Kubric's identification of Petitioner in violation of his Due Process rights.

7.     The trial court erred in denying his motion to transfer venue from the "jail courtroom" to a regular courtroom in violation of his Due Process rights and presumption of innocence safeguards.

8.     The trial court erred in denying Petitioner's Motion to Suppress.

9.     The trial court erred in entering conclusions of law No. 4, 5, and 6, pertaining to the CrR 3.6 motion to suppress evidence.

10.     Petitioner was denied effective assistance of counsel guaranteed by the Sixth Amendment and article I, section 22 when his defense attorneys failed to move to suppress evidence pursuant to CrR 3.6 prior to trial on counts 1-6.

11.     The trial court erred in admitting evidence of a nine millimeter handgun unrelated to the charged crime and evidence of Petitioner's post-arrest conduct in violation of his Due Process rights and contrary to ER 403 and 404(b).

12.     The trial court erred in barring Petitioner from inquiring or arguing that Manuel Sanchez was a "jacker" and in instructing the jury to disregard testimony to this effect, and in barring the defense from introducing evidence of the blue truck owned by Ramon Marmalejo in violation of his Sixth Amendment right to present a defense and to effective assistance of counsel.

13.     Cumulative error denied Petitioner the right to a fair trial secured by the Fourteenth Amendment and Wash. Const. art. 1, § 3.

*Id.*

The Court of Appeals affirmed the judgment and conviction on September

30, 2012, ECF No. 15, Ex. 2 and denied Petitioner's Motion for Reconsideration on January 28, 2013. ECF No. 15, Ex. 20.

Petitioner petitioned the Washington Supreme Court for review. ECF No. 15, Ex. 21. He presented the following issues in his Petition for Review:

1. Whether conducting his trial in the jail violated due process rights and the presumption of innocence.

2. Whether disqualification of his counsel of choice was improper under ethical lawyer-as-witness and conflict-of-interest provisions and violated his Sixth Amendment right to counsel of choice and his Fourteenth Amendment right to equal protection.

3. Whether Petitioner's rights to be present and to a public trial were violated when the court excluded him from a hearing regarding the appointment of new counsel

4. Whether his due process rights were violated by the admission of Michelle Kubric's identification of him, or whether an independent state constitutional analysis under article I, § 3 compels exclusion.

5. Whether his trial counsel was ineffective for failing to bring a meritorious motion to suppress the fruits of his arrest prior to trial.

6. Whether the Court of Appeals erred when it held that evidence acquired as a direct result of his arrested was too attenuated from the arrest to be excluded.

7. Whether ER 403 and 404(b), and Petitioner's due process rights were violation by the introduction of certain evidence.

8. Whether the trial court erred in excluding evidence necessary for Petitioner to argue his theory of the case.

9. Whether cumulative error denied Petitioner his right to a fair trial.

ECF No. 15, Ex. 21.

The Washington Supreme Court denied his petition for review on August 5, 2013. ECF No.15, Ex. 22. The mandate was issued on August 14, 2013. ECF No. 15, Ex. 23.

### (3)   Personal Restraint Petition

Petitioner filed his Personal Restraint Petition (PRP) on August 8, 2014. ECF No. 15, Ex. 24. He was represented by Susan F. Wilk. In his PRP, he presented the following arguments:

> 1.  Petitioner was denied his Sixth Amendment right to counsel at a critical stage when he was arraigned without counsel, resulting in irreversible forfeiture of substantial rights and prejudice to his right to a fair trial.
>
> 2.  Alternatively, counsel was ineffective when he failed to object to Petitioner being filmed by the media at his arraignment, which prejudiced him.

*Id.*

The Washington Court of Appeals denied his petition on January 26, 2017. ECF No. 15, Ex. 29. The Washington Supreme Court denied review on August 21, 2017, ECF No. 15, Ex. 32 and the mandate issued on October 18, 2017. ECF No. 15, Ex. 33.

## I.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 n.7 (2000). Petitioner was convicted by jury verdict in Yakima County Superior Court of two counts of aggravated first degree murder, two counts of attempted first degree murder, first degree robbery, and first degree burglary. In a bench trial that followed, he was found guilty of first degree

unlawful possession of a firearm. The court sentenced him to life without the possibility of parole.

Petitioner filed a federal habeas corpus petition pursuant to 28 U.S.C. § 2254 and is currently in Washington State custody confined at the Monroe Correctional Complex –Twin Rivers Unit, in Monroe, Washington. Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution and the challenged convictions arise out of the Yakima County Superior Court, which is located within the jurisdiction of this Court. Accordingly, the Court has jurisdiction over the action.

## II.     Legal Standard

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. *Chein v. Shumsky*, 373 F.3d 978, 983 (9th Cir. 2004). Since Petitioner filed the petition for habeas corpus after April 24, 1996, the provisions of the AEDPA govern.

Under the AEDPA, an application for habeas corpus will not be granted unless the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 70 (2003). Only "clearly established Federal law, as determined by the Supreme Court of the United States" can be the basis for relief under the AEDPA. *Campbell v. Rice*, 408 F.3d 1166, 1170 (9th Cir. 2005). "Clearly established Federal law" is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision. *Lockyer*, 538 U.S. at 71.

A state court decision is "contrary to" clearly established Supreme Court

precedent "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court cases or "if the state court confronts a set of facts that are materially indistinguishable from" a Supreme Court decision but "nevertheless arrives at a result different from" that precedent. *Id*. at 73. A state court decision is an "unreasonable application of clearly established federal law" if "the state court identifies the correct governing legal principle" from a Supreme Court decision "but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 75. A federal court may also grant a writ of habeas corpus if a material factual finding of the state court reflects "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). State court findings of fact are presumptively correct in federal habeas proceedings, and the petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. §2254(e)(1). In considering potential state court error, this court looks to the "last reasoned decision of the state court as the basis of the state court's judgment." *Franklin v. Johnson*, 290 F.3d 1223, 1233 n.3 (9th Cir. 2002).

In short, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'" *Id.* at 473-74.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996). A pro se prisoner's request for relief will be construed liberally as a habeas petition despite formal imperfections. *United States v. Seesing*, 234 F.3d 456, 463-64 (9th Cir. 2000) (holding that pro se filings are to be liberally construed).

## III.  Motion for Pro Bono Counsel

Petitioner moves the Court to appoint pro bono counsel. ECF No. 13. State prisoners do not have a constitutional right to counsel when mounting collateral attacks upon the judgement of a state court pursuant to § 2254. *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987). By statute, district courts have discretion to appoint an attorney in habeas corpus proceedings when "the interests of justice so require and [the prisoner] is financially unable to obtain representation." 18 U.S.C. § 3006A(a)(2)(B). Counsel should be appointed when the "difficulties involved in presenting a particular matter are such that a fair and meaningful hearing cannot be had without the aid of counsel." *Dillon v. United States*, 307 F.2d 445, 447 (9th Cir. 1962). Appointment is mandatory only when the circumstances of a particular case indicate that appointed counsel is necessary to prevent due process violations. *Chaney v. Lewis*, 801 F.2d 1191, 1196 (9th Cir. 1986).

Here, appointment of counsel is not warranted. In the instant case, the issues are straightforward. Petitioner is in possession of all the relevant facts and he has demonstrated he has a good understanding of the issues presented, and the ability to coherently present his contentions.

## IV.  Evidentiary hearing

An evidentiary hearing is not required on issues that can be resolved by reference to the state court record." *Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998) (affirming the denial of an evidentiary hearing where the applicant's factual allegations "fl[ew] in the face of logic in light of ... [the applicant's] deliberate acts which are easily discernible from the record").

Here, there are no factual allegations that need to be resolved through an evidentiary hearing. As such, an evidentiary hearing is not necessary.

## V.  Exhaustion of State Remedies

Respondent does not challenge that Petitioner properly exhausted claims 1-7 and 9-13, but asserts that he failed to properly exhaust Claim 8.

In Claim 8, Petitioner argues his conviction should be reversed because the state presented insufficient evidence to prove that he possessed the nine millimeter handgun that was the subject of Count 7 of the criminal complaint. Petitioner did not present this argument in his direct appeal or in his PRP.

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (quotations omitted). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Id.*

Despite that Petitioner did not fairly present this particular claim to the Washington state courts, he had exhausted his state court remedies at the time he filed for habeas relief in the federal district court. This is because Petitioner is procedurally barred from pursuing remedies in state court. *See Casey v. Moore*, 386 F.3d 896, 919 (9th Cir. 2004) (explaining that exhaustion can occur by fair presentation to the appropriate state courts or when some independent and adequate state ground bars relief). Wash. Rev. Code § 10.73.090, which sets forth a one year statute of limitations for collateral attacks, provides an independent and adequate state ground to bar federal review of Claim 8. *See Shumway v. Payne*, 223 F.3d 982, 989 (9th Cir. 2000) (holding that the petitioner had "failed to demonstrate that Wash. Rev. Code § 10.73.090 is not an adequate and independent state procedural rule that bars her claims from federal habeas review.").

Here, Petitioner is procedurally barred from presenting Claim 8 because the statute of limitations has passed. Consequently, the procedural bar that exhausted Petitioner's claim (by making it impossible for him to fairly present his federal claims to state court) also renders the federal claims unavailable for review

because it has been defaulted on account of an adequate and independent state law ground.[3]

## VI.  Review of Petitioner's Claims

In his Petition, Petitioner presents thirteen separate claims for habeas relief, although most fall under the rubric of the Sixth Amendment:

### (1)  Sixth Amendment

#### A.  Denial of Sixth Amendment Right to Assistance of Counsel

The Sixth Amendment provides, that [i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." *Strickland v. Washington*, 466 U.S. 668, 684-85 (1984) (quoting U.S. Const. amend. VI). This includes the right to effective assistance of counsel and the right to select counsel of one's choice, although an indigent defendant does not have the right to counsel of choice. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 146-48 (2006).

### <u>Claim 1</u>

In Claim 1, Petitioner argues the trial court denied him his Sixth Amendment right to the assistance of counsel and impermissibly intruded into his protected

_____

[3] If a state procedural bar is an adequate and independent ground warranting dismissal, relief by writ of habeas corpus is foreclosed in federal court unless the petitioner can show cause for the procedural default and resulting prejudice, or show that a failure to consider his claims would result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Noltie v. Peterson*, 9 F.3d 802, 804–05 (9th Cir. 1993). As for cause, "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Coleman*, 501 U.S. at 753 (internal quotation marks omitted). Petitioner has not shown cause or prejudice.

attorney client relationship when it disqualified his counsel of choice. He argues the trial court incorrectly found that his original trial counsel had become a witness in the case even though a third person had been present during the communications with witnesses. He alleges the trial court erred in basing its removal of the original trial counsel on counsel's removal of witnesses from the jurisdiction without sufficient evidence to support its decision.

Here, the Washington Court of Appeals correctly found that Petitioner did not have a Sixth Amendment right to his choice of counsel because he had not retained his counsel. *See Gonzalez-Lopez*, 548 U.S. at 151 (noting the right to counsel of choice does not extend to defendants who require counsel to be appointed for them). Petitioner is not entitled to relief because the Washington Court of Appeals' decision was not contrary to, or an unreasonable application of, clearly established federal law. Claim 1 is denied.

### Claim 2

Petitioner argues the trial court violated his Sixth Amendment right to counsel at a critical stage when it excluded him from an in-chambers discussion that took place several weeks after his initial appointed counsel were disqualified. The discussion was between the trial judge and L. Daniel Fessler, who was the director of the Yakima County Department of Assigned Counsel (DAC), in which they discussed the appointment of new counsel for Petitioner. Petitioner was not present for the discussion.

The Sixth Amendment safeguards to an accused who faces incarceration the right to counsel at all critical stages of the criminal process. *Iowa v. Tovar*, 541 U.S. 77, 80 (2004). Once the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all "critical" stages of the criminal proceedings. *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009). An accused's right to have assistance of counsel for his or her defense encompasses counsel's assistance whenever necessary to assure a meaningful

defense. *United States v. Wade*, 388 U.S. 218, 225 (1967). In addition to counsel's presence at trial, "the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." *Id.*

"A critical stage is a 'trial-like confrontation, in which potential substantial prejudice to the defendant's rights inheres and in which counsel may help avoid that prejudice.'" *United States v. Leonti*, 326 F.3d 1111, 1117 (9th Cir. 2003) (quotation omitted). Critical stages include, for example, post-indictment police lineups, arraignments, and sentencing. *Id.* (citations omitted). The essence of a "critical stage" is not its formal resemblance to a trial, but the adversary nature of the proceeding, combined with the possibility that a defendant will be prejudiced in some significant way by the absence of counsel. *Id.*

The Washington Court of Appeals found that Petitioner's exclusion from the trial court's discussion with Mr. Fessler about appointing new counsel did not violate his constitutional confrontation, due process and public trial rights because the meeting between Mr. Fessler and the trial court was to address only the administrative need to find counsel for Petitioner. ECF No. 15, Ex. 2, at 38. It reasoned that because the lawyer selection and appointment process does not involve the introduction of the factual and legal issues of the case, and because an indigent defendant has no right to input in the process, the meeting between the trial court and Mr Fessler did not constitute a critical stage that required Petitioner's presence. *Id.*

The Washington Court of Appeals' conclusion that the meeting was not a critical stage of the proceedings that required Petitioner's presence was reasonable. Petitioner's presence at the meeting to discuss the appointment of counsel was not necessary to provide Petitioner with a fair trial and was not an integral part of the adversary process. The nature of the meeting was not adversarial. Moreover, Petitioner has not shown that he was prejudiced in any way by his failure to attend

the meeting.

Petitioner has not rebutted the presumption of correctness that is afforded the Washington Court of Appeals' findings and conclusion; therefore habeas relief on this claim is not appropriate. The Washington Court of Appeals' denial of his Sixth Amendment claim was not contrary to, or an unreasonable application of, established federal law. Claim 2 is denied.

### Claim 7

Petitioner argues he was denied effective assistance of counsel when his trial defense attorneys failed to move to suppress evidence prior to the jury trial on Counts 1-6.

To establish ineffective assistance of counsel, a defendant must prove: (1) "counsel's representation fell below an objective standard of reasonableness," and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011).

A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Strickland*, 466 U.S. at 689. It is Petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687.

"The standards created by *Strickland* and [AEDPA] are both highly deferential, and when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105 (internal quotation marks and citations omitted). In considering the state court's denial of Petitioner's IAC claims, then, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Id*. at 101. The Court does not determine whether counsel's performance fell below

*Strickland's* standard because "'an unreasonable application of federal law is different from an incorrect application of federal law.'" *Id*. (quoting *Williams v Taylor*, 529 U.S. 362, 410 (2000)). Thus, the Court must "guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under [AEDPA]. . . . The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id*. at 105. This means a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id*. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

After the jury trial, but before the bench trial on the charge of first degree unlawful possession of a firearm, Petitioner's counsel moved to suppress evidence of the 9mm handgun that was found in Ramon Marmelejo's car. Although the trial court denied the motion, the Washington Court of Appeals concluded that the trial court erred in denying the motion to suppress for purposes of Count 7.[4] Petitioner argues that his counsel provided ineffective assistance by not moving to suppress evidence obtained through the unlawful arrest before the jury trial on counts 1-6. He argued before the Washington Court of Appeals that the unlawful arrest provided a basis for excluding both the 9mm handgun and the evidence of his attempt to eat money while in the holding cell.

The Washington Court of Appeal concluded that it was unable to evaluate whether a motion to suppress would have been granted given that the Court had previously concluded the State failed to present any evidence regarding the reliability of the anonymous informant or the timing of arrest and the obtaining of incriminating information from Albert Vasquez and Luz Carillo. ECF No. 15, Ex.

---

[4] The Washington Court of Appeal ultimately concluded the error was harmless beyond a reasonable doubt because the trial court also found Petitioner unlawfully possessed the .45 handgun used in the killing. ECF No. 15, Ex. 2, at 43.

2, at 43. Now that the tables had turned, Petitioner could not meet his burden to show that a motion to suppress likely would have been granted. *Id.*

Ultimately, the Washington Court of Appeals concluded that Petitioner could not show that he was prejudiced by the failure to move to suppress the evidence prior to the jury trial. *Id.* at 44. It noted that "a good deal of evidence of the 9mm handgun was presented at trial that Sanchez made no effort to exclude and to which he did not object. Since the jury was well aware that Sanchez was associated with a 9mm handgun, its learning that he possessed one when arrested would not likely have changed the trial outcome." *Id.* The Washington Court of Appeals also rejected Petitioner's argument that he was prejudiced when evidence that he ate money was admitted at trial. *Id.* The Washington Court of Appeals relied on *Wong Sun*[5] to conclude that evidence of Petitioner eating money was too attenuated from the arrest so any taint from the illegal arrest was dissipated. *Id.*

---

[5] In *Wong Sun*, the United States Supreme Court set forth the principles to be applied in determining whether statements and other evidence obtained after an illegal arrest or search should be excluded. *Wong Sun v. United States*, 371 U.S. 471 (1963). There, the Court held that the connection between the defendant's unlawful arrest and his statement had "become so attenuated as to dissipate the taint," given the defendant was arraigned and released on his own recognizance and he returned voluntarily several days later to make his statement. *Id.* at 491. It noted:

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

*Id.* at 487-88.

The Washington Court of Appeals' conclusion that Petitioner failed to show he was prejudiced by his counsel's failure to move to suppress evidence prior to his jury trial was not contrary to, or an unreasonable application of, established federal law. Petitioner cannot show the failure to file the motion to suppress prior to the jury trial in any way prejudiced him. Given the other evidence of gun ownership introduced at trial, Petitioner cannot establish that the outcome of his trial would have been different. Moreover, the Washington Court of Appeals' application of *Wong Sun* was not unreasonable. Claim 7 is denied.

### B.    Defects in the Arraignment Process

In Claim 12, Petitioner argues he was represented at a critical stage by a lawyer who had a conflict of interest that resulted in a constructive denial of counsel. In Claim 13, Petitioner argues his right to effective assistance of counsel was violated when his counsel failed to appear at his arraignment to object to him being filmed.

The Washington Court of Appeals summarized the facts regarding Petitioner's arraignment as follows[6]:

> Police arrested Sanchez on February 23, 2005, after acting on anonymous telephone tips that he was responsible for the Causor murders. The next day, he appeared for a single court hearing on two matters: (1) arraignment on an outstanding 2004 matter charging him with certain felonies, and (2) a preliminary appearance in the current murder case. The prosecutor was present but no attorney appeared for Sanchez. First addressing the 2004 matter, the court advised Sanchez of his rights, which he acknowledged he understood before requesting that the court appoint counsel. The prosecutor interjected that an attorney had already been appointed on the 2004 matter, but that Yakima County public defender/director of assigned counsel, Daniel Fessler, was requesting that the court appoint him on both matters. The court did so. The court then explained to Sanchez that he was being held under investigation on suspicion for first degree murder, attempted first degree murder, first degree robbery, and felon in possession of a firearm. Based on a police probable cause declaration

---

[6] *In re Sanchez*, 197 Wash.App. 686 (2017).

showing that acquaintances of Sanchez had implicated him in the robbery and murders, the court found probable cause to believe Sanchez committed one or more crimes. The probable cause declaration also stated that "victim Michelle Kublic was shown a photo montage, which included 'Gato's' photo, whose name is Mario Mendez. She positively identified him as one of the males who entered her house and shot them." The court set Sanchez's bail at $5 million and scheduled his arraignment for February 28.

On February 28, 2005, the State formally charged Sanchez and Mendez (who still remained at large) with seven crimes including two counts of aggravated first degree murder, which carried a possible death penalty. That day, Sanchez and an unknown number of other defendants appeared in superior court for a group arraignment hearing. The court explained their rights and noted that each "has a lawyer appointed to represent you or you might have hired a private attorney."

The court then explained the process for the arraignment hearing:

[W]hen your name is called we'll ask you to step up to the counter in front of this microphone. The prosecutor will hand you a piece of paper called an information. That lists the charges. She will read that to you if you want her to read it out loud. You don't have to have it read out loud.

After that, I'm going to ask you a couple of questions. I'm going to ask you if you understand the charges and if you have any questions about the rights I have just explained.

If you don't have questions, I am going to hand you an order. On the order there is the next two dates that you need to be in court. One is for an omnibus hearing. The next is for your trial.

. . . .

Many of you have not had a chance to talk to your lawyer yet, if it's appointed counsel. You're [sic] lawyer is going to get a packet of information from the prosecutor's office in the next couple of days. They will schedule a time to come and meet with you.

At the end of all this I'm going to hand you that order and ask you to sign the order at the bottom of the page. By signing the order you're not admitting that you have done anything wrong. It lets us know that you have gotten a copy of the paperwork today.

The court then called Sanchez's case. The court's prior explanation of rights to the defendants included the right to counsel, but did not specify any right to have counsel present during the

current hearing. No attorney appeared for Sanchez. The prosecutor recited the seven charges and gave Sanchez a copy of the information. Sanchez acknowledged to the court that he understood the charges, and he declined a full reading of the information. He said he had no questions about the rights previously explained to him. The court entered an order setting dates for the omnibus hearing and trial. Sanchez signed the order and received a copy.

No one broached the subject of entering a plea during the arraignment. The court apparently entered summary not guilty pleas for Sanchez. No concerns regarding the arraignment procedure were ever voiced during the remainder of the pretrial and trial proceedings.

*In re Sanchez*, 197 Wash.App. at 689-91.

### <u>Claim 12</u>

Petitioner argues that at his arraignment, he was represented by L. Daniel Fessler, who had an unwaivable conflict because either he or his office had previously represented the victims, as well as an uncharged co-conspirator. According to Petitioner, he was represented at a critical stage by a lawyer who had a conflict of interest, which resulted in a constructive denial of counsel. He maintains this was a structural error.

A criminal defendant has a Sixth Amendment right to counsel that attaches at all critical stages in the proceedings. *Wade*, 388 U.S. at 224. This right extends to "any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." *Id.* at 226. The Court must "analyze whether potential substantial prejudice to defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice." *Id.*

The U.S. Supreme Court instructs that "the right to counsel attaches at the initial appearance before a judicial officer." *Rothgery v. Gillespie Cnty, Tex.*, 554 U.S. 191, 198 (2008). It went on to explain:

[a]ttachment occurs when the government has used the judicial machinery to signal a commitment to prosecute as spelled out in *Brewer [Brewer v. Williams*, 430 U.S. 387 (1977)] and *Jackson*

[*Michigan v. Jackson*, 475 U.S. 625 (1986)]. Once attachment occurs, the accused at least is entitled to the presence of appointed counsel during any "critical stage" of the postattachment proceedings; what makes a stage critical is what shows the need for counsel's presence. Thus, counsel must be appointed within a reasonable time after attachment to allow for adequate representation at any critical stage before trial, as well as at trial itself.

*Id*. at 211-12.

A criminal defendant's Sixth Amendment right to counsel includes the right to be represented by an attorney with undivided loyalty. *Wood v. Georgia*, 450 U.S. 261, 271 (1981). This guarantee is so important that, unlike with other Sixth Amendment claims, when a defendant alleges an unconstitutional actual conflict of interest, "prejudice must be presumed," *Delgado v. Lewis*, 223 F.3d 976, 981 (9th Cir. 2000) (citation omitted), and harmless error analysis does not apply. *United States v. Allen*, 831 F.2d 1487, 1494–95 (9th Cir.1987) (citation omitted).

Initially, the Court interpreted Petitioner's claim as arguing that he was actually represented at the February 24, 2005 initial appearance by Mr. Fessler and this violated his Sixth Amendment right to counsel as Mr. Fessler had an unwaivable conflict. A review of the transcript of the initial appearance clarified that this was not so. Mr. Fessler was not present at the initial appearance. At the February 24, 2005 hearing, Petitioner was arraigned on charges of second degree taking a motor vehicle without permission, second degree malicious mischief, and bail jumping. ECF No. 15, Ex. 24, at 896-97. At the arraignment, he was advised of his rights to counsel, right to a speedy and public trial, right to remain silent, right to not testify, right to question witnesses, and was informed of the presumption of innocence, and right to appeal a guilty verdict. Petitioner stated he understood those rights, and also requested a court-appointed attorney. *Id*. The judge appointed counsel and the prosecutor attending the hearing indicated that although other counsel was previously appointed on the outstanding 2004 matter, Mr. Fessler had requested that he be appointed because he would be dealing with

the other case. *Id*. at 899. It does not appear Petitioner is challenging the process provided in arraigning him on the charges of second degree taking a motor vehicle without permission, second degree malicious mischief, and bail jumping.

With respect to the second matter, the judge informed Petitioner that he was being held on suspicion of two counts of murder in the first degree, attempted murder in the first degree, robbery in the first degree and felon in possession of a firearm. *Id*. at 900. The judge made a finding of probable cause and appointed Mr. Fessler to represent Petitioner in the matter. *Id*.

Petitioner did not argue on his direct appeal or in his Personal Restraint Petition that his Sixth Amendment rights were violated at the February 24, 2005 hearing due to the conflict of Mr. Fessler. Consequently, to the extent this is the nature of Claim 12, the Court will not address this argument.

To the extent, Petitioner is arguing that his Sixth Amendment rights were violated when Mr. Fessler or any other counsel failed to show up and represent him at the February 28, 2005 arraignment, this argument was presented in Petitioner's Personal Restraint Petition. There, he argued that even though he had been appointed counsel, his lawyer's failure to show up resulted in a complete deprivation of counsel.

The Washington Court of Appeals concluded that the pretrial hearing was not a critical stage of the prosecution, *In re Sanchez*, 197 Wash. App. at 702 and the Washington Supreme Court affirmed that conclusion. ECF No. 15, Ex. 32, at 3. It noted that Petitioner failed to show that "any right or defense he possessed prearraignment was forfeited or went unpreserved by his attorney's absence at arraignment." *Id*. The Washington courts concluded that because the hearings were better characterized as informal hearings where Petitioner stood no risk of waiving any rights or foregoing any defenses, made no admissions of guilt, did not forfeit any rights to plead guilty, or risked forfeiting any right to plead not guilty by reason of insanity, the proceedings "lacked the substance so as to confer on it

"critical stage" status. *Id.*; *In re Sanchez*, 197 Wash.App. at 702. Thus, any infringement on his right to counsel did not give rise to a presumed prejudice or structural error. *Id.*

The Washington courts' denial of Petitioner's claim of Denial of Effective Assistance of Counsel was not contrary to, or an unreasonable application of, established federal law. Petitioner has not rebutted the presumption afforded the state court's findings or shown that under the Washington criminal system, the initial proceeding or arraignment are a critical stage of the proceedings requiring the presence of counsel. Counsel's failure represent Petitioner at the arraignment was not a violation of the Sixth Amendment. Claim 12 is denied.

### Claim 13

Petitioner maintains that at his arraignment his counsel should have objected to the presence of the media in the courtroom. Because his counsel was not there and could not object, he received ineffective assistance of counsel.

In reviewing Petitioner's claim under the *Strickland* framework, both courts concluded that Petitioner failed to show he was prejudiced by any news coverage. Both courts noted that Petitioner failed to present any evidence that the victim identified him from news media photographs obtained at the arraignment. ECF No. 15, Ex. 32, at 1168-69; *In re Sanchez*, 197 Wash.App. at 704-05. On the contrary, the record shows only that the victim told police that she first recognized him from the news after she was out of the hospital. *Id.* The news media had extensively covered the case by that point and it is not clear from the record what photograph or footage the victim saw that led to her recognizing Petitioner. *Id.* It was mere speculation to conclude that the photograph or footage that she saw was footage or photographs from the arraignment. *Id.* Finally, the courts also noted that Kublic's identification of Petitioner was not the only evidence the State produced linking him to the crimes. *Id.*

The Washington courts' denial of Petitioner's Ineffective Assistance of

Counsel claim was not contrary to, or an unreasonable application of, established federal law. Petitioner cannot not show that he was prejudiced by the presence of the media at his arraignment and thus, cannot establish a Sixth Amendment violation of his right to counsel. Claim 13 is denied.

### C.    Sixth Amendment Right to a Public Trial
<u>Claim 3</u>

Petitioner argues the trial court violated his Sixth Amendment right to public trial when it held a closed proceeding on the appointment of new counsel and excluded him from participating.

"The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." *Waller v. Georgia*, 467 U.S. 39, 46 (1984)(citations and quotations omitted). "In addition to ensuring that judge and prosecutor carry out their duties responsibly, a public trial encourages witnesses to come forward and discourages perjury." *Id.* That said, limited closure of proceedings can serve a substantial institutional interest without violating the Sixth Amendment. *Id.* at 47.

The first question that must be answered is whether *Waller* applies in this instance. The United States Supreme Court has not held that in-chambers conferences violate the right to public trial. Generally, legal arguments over relatively routine administrative matters do not implicate the concerns expressed in *Waller*, such as discouraging perjury and assuring that the judge and prosecutor carry out its duties responsibly.

The Washington Court of Appeals held that because the meeting was not an evidentiary phase of the trial, or an adversary proceeding, or involved a matter that required resolution of disputed facts, Petitioner did not have a right to a public hearing. ECF No. 15, Ex 2, at 39.

Given the lack of holdings from the United States Supreme Court regarding the whether the Sixth Amendment right to a public trial attaches to a purely administrative proceeding of the kind involved here, it cannot be said that the state court "unreasonabl[y] appli[ed] clearly established Federal law." *See Carey v. Musladin*, 549 U.S. 70, 76 (2000). Consequently, the state court's decision was not contrary to or an unreasonable application of clearly established federal law and habeas relief is not warranted on Claim 3.

### (2) Due Process Violations

#### A. Witness Identification (Claim 4)

Petitioner argues the trial court violated his right to due process when it admitted at trial the victim's identification of himself.

Generally, the reliability of relevant testimony typically falls within the province of the jury to determine. *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012). That said, the United States Supreme Court has recognized due process safeguards where the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime. *Id.*

Even if an identification is infected by improper police influence, however this evidence is not automatically excluded. *Id.* Rather, the trial judge must screen the evidence pretrial for reliability. *Id.* If there is "a very substantial likelihood of irreparable misidentification," the evidence should not be admitted at trial. *Id.* (quotation omitted). "But if the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth." *Id.*

"When no improper law enforcement activity is involved, . . . it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the

fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt." *Id.* "The fallibility of eyewitness evidence does not, without the taint of improper state conduct, warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing the jury to assess its creditworthiness." Courts must assess, on a case-by-case basis, whether improper police conduct created a "substantial likelihood of misidentification. *Id.*

Petitioner's counsel moved to suppress any in-court identification by the victim, Michelle Kublic, because her ability to identify him had been irreparably tainted. After holding a three-day hearing, the trial court denied the motion finding no evidence that the police officers investigating the murder did anything that could be construed as unduly suggestive nor did they violate any recognized obligation to guard against a witness viewing news coverage.

At trial, Petitioner cross-examined Kublic about her identification. He also called Dr. Robert Shomer, a forensic psychologist who testified to problems with eyewitness identification in general and to Kublic's identification of Petitioner in particular.

The Washington Court of Appeals concluded the trial court did not err in denying Petitioner's motion to suppress Kublic's identification of Petitioner. *Sanchez*, 171 Wash. App. at 383. It concluded that presenting a picture to a witness twice did not qualify as improper police conduct. *Id.* Moreover, the trial court provided Petitioner with broad latitude to challenge Kublic while the weight and credibility of her testimony was for the jury to decide. *Id.*

The Washington Court of Appeals correctly applied the reasoning of *Perry* to conclude that Petitioner failed to establish that improper police techniques. Petitioner has not shown that the police used improper police techniques. Where the police have not used improper techniques, it is for the jury to decide the reliability of the eyewitness testimony. The Washington Court of Appeals' conclusion that the trial court did not err in admitting the victim's identification of

Petitioner was not contrary to, or an unreasonable application of federal law. Consequently, habeas relief on Claim 4 is available.

## B    Denial of Motion to Transfer Venue (Claim 5)

Petitioner argues the trial court violated his Due Process rights, as well as his Equal Protection rights and privileges and immunities clause when it denied his motion to transfer venue from the "jail courtroom" to a regular courtroom.

The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment. *Estelle v. Williams*, 425 U.S. 501, 503 (1976). Central to that right "is the principle that 'one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial.'" *Holbrook v. Flynn*, 475 U.S. 560, 567 (1986) (quoting *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978)). "The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." *Estelle*, 425 U.S. at 503. "To implement the presumption, courts must be alert to factors that may undermine the fairness of the fact-finding process. In the administration of criminal justice, courts must carefully guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt." *In re Winship*, 397 U.S. 358, 364 (1970).

While the actual impact of a particular practice on the judgment of jurors cannot always be fully determined, the U.S. Supreme Court has instructed courts to exercise close judicial scrutiny when faced with "the probability of deleterious effects on fundamental rights." *Id.* "Courts must do the best they can to evaluate the likely effects of a particular procedure, based on reason, principle, and common human experience." *Id.* On the other hand, the U.S. Supreme Court has instructed that "[i]t is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country."

*Illinois v. Allen*, 397 U.S. 337, 343 (1970).

Security measures at trial are inherently prejudicial when they "tend to brand the defendant in the jurors' eyes with an unmistakable mark of guilt," or when they create "an unacceptable risk of impermissible factors coming into play." *Williams v. Woodford*, 384 F.3d 567, 588 (9th Cir. 2004) (quotations omitted).

In *Holbrook*, the petitioner challenged the presence of four uniformed state troopers sitting in the first row of the spectator's section during the petitioner's and his five other co-defendant's trial. *Id.* at The uniformed troopers were hired to provide additional security at the trial, due to constraints on the courtroom's security personnel. *Id.* at 563. In reversing the grant of the habeas petition, the U.S. Supreme Court stated:

> All a federal court may do in such a situation is look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over.

*Id.* at 572.

The Washington Court of Appeals concluded the trial court's decision to hold the trial in the jailhouse courtroom was not an abuse of discretion. *Sanchez*, 171 Wash. App. at 571. It also questioned whether *Holbrook* stands for the proposition that jailhouse courtroom are inherently prejudicial. *Id.* at 569.

Given the lack of holdings from the United States Supreme Court regarding the whether jailhouse courtrooms are inherently prejudicial, it cannot be said that the state court "unreasonabl[y] appli[ed] clearly established Federal law." *See Carey*, 549 U.S. at 76. Consequently, the state court's decision was not contrary to or an unreasonable application of clearly established federal law and habeas relief is not warranted on Claim 5. Moreover, Petitioner has not shown actual prejudice by the use of the jailhouse courtroom.

### (3) Denial of Motion to Suppress (Claim 6)

Petitioner argues the trial court erred when it denied his motion to suppress evidence.

Petitioner moved to exclude evidence of a 9mm handgun that was discovered under the passenger seat of the car where Petitioner was sitting at the time of his arrest. The trial court denied the motion. The Washington Court of Appeals concluded that the presence of the 9mm corroborated testimony from the co-defendant and other witnesses of events leading up to the robbery and murder, including testimony that Petitioner regularly carried on of the two firearms he owned (the 9mm and the .45) and testimony about who hoped to use the 9mm in the planned robbery. ECF No. 15, Ex. 2, at 43. It noted that evidence of Petitioner's ownership of the guns was presented through the testimony of three witnesses. *Id.* As such, even if the trial court abused its discretion in admitting evidence of the 9mm, such admission was harmless. *Id.*

The United States Supreme Court has instructed that where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 481 (1976). "The relevant inquiry is whether petitioner had the opportunity to litigate his claim, not whether he did in fact do so or even whether the claim was correctly decided." *Newman v. Wengler*, 790 F.3d 876, 880 (9th Cir. 2015) (quoting *Ortiz–Sandoval v. Gomez*, 81 F.3d 891, 899 (9th Cir.1996)).

Here, it is clear from the record that Petitioner had an opportunity for a fair hearing regarding the admission of the gun. This forecloses any further inquiry on this claim. As such, Claim 6 is denied.

//

//

### (4)     Right to Present a Defense (Claim 9)

Petitioner argues the trial court denied him the right to present a defense when it barred him from presenting certain evidence. Specifically, he asserts he should have been allowed to present evidence that Mr. Manuel Sanchez was a "jacker" and to present evidence that another suspect Ramon Marmalejo owned a blue truck. He also asserts the trial court erred in refusing to issue a missing witness instruction regarding Mr. Marmalejo.

While the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense," state and federal lawmakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. *Nevada v. Jackson*, 569 U.S. 505, 509 (2013) (citations omitted). On the other hand, arbitrary rules that are disproportionate to the purpose they are designed to serve and result in the denial of a complete defense are unconstitutional. *Holmes v. South Carolina*, 547 U.S. 319, 325 (2006). Only rarely is the right to present a complete defense violated by the exclusion of defense evidence under a state rule of evidence. *Jackson*, 569 U.S. at 509.

Also, with respect to other suspect evidence, the United States Supreme Court has recognized that rules regulating the admission of evidence proffered by criminal defendants to show that someone else committed the crime with which they are charged are widely accepted. *Holmes*, 547 U.S. at 327. It noted that generally, evidence tending to show another person committed the crime charged may be introduced by an accused when it is inconsistent with, and raises a reasonable doubt of, his own guilt; but frequently matters offered in evidence for this purpose are excluded because they are so remote and lack any connection with the crime. *Id.* (quoting 41 C.J.S., Homicide § 216, pp. 56–58 (1991)). It also noted that such evidence may be excluded where it does not sufficiently connect the other person to the crime, such as where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial.

*Id.* (quoting 40A Am.Jur.2d, Homicide § 286, pp. 136–138 (1999)).

### A. Evidence that Manuel Sanchez as a "Jacker"

"Jacking" is a term for robbery. The term "jacking" was introduced at the trial when Petitioner's lawyer asked Carolos Orozco about Manuel Sanchez.[7] Counsel asked Orozco if Manuel's main thing was jacking people. Orozco answered yes. He was asked if Manuel robbed people in order to get money for his meth, and Orozco answered yes.

The prosecutor then wanted to ask Orozco whether Petitioner was a "jacker," contending the defense open the door to otherwise inadmissible information that Manuel and Petitioner had committed robberies together. The trial court did not permit this line of questioning, concluding the door had not been opened. The prosecution then asked for an order in limine precluding defense counsel from further referring to Manuel as a "jacker." The trial court instructed the jury to disregard any reference to Manuel Sanchez as being a jacker and to not consider that testimony for purposes of their ultimate deliberations.

The trial court permitted the jury instruction because it concluded that Petitioner could not have it both ways. Petitioner could not prevent evidence of his own propensity for jacking, but then offer the same evidence of jacking of his brother, hoping to persuade the jury that it was his brother who committed the murder and robbery for which he was on trial. The trial court ruled the evidence inadmissible under Evidence Rule 404(b).

The Washington Court of Appeals agreed that evidence that Manuel is a jacker is 404(b) propensity evidence:

> Evidence that jacking people was Manuel's "main thing" and the way
> he paid for his meth is also propensity evidence that is inadmissible

---

[7] Manuel Sanchez is Petitioner's brother. Petitioner maintained that his brother Manuel participated in the robbery, not him. To avoid confusion, the Court refers to Manuel Sanchez by his first name.

under the rule when offered for the purpose offered by Sanchez. Evidence of a person's occupation is normally not restricted by ER 404(b), but the restrictions may come into play if the person's occupation is, itself, criminal in nature.

ECF No. 15, Ex. 2, at 45.

The Court of Appeals ultimately concluded that suppression of the jacker evidence did not deprive Petitioner of the opportunity to present his "other suspect" theory, especially in light of the fact that Petitioner was permitted to present evidence that Manuel planned to participate in the robbery of Causor. *Id.* at 46.

This conclusion was not contrary to, or an unreasonable application of, federal law. The state evidence rule at issue, ER 404(b), prohibits the introduction of propensity evidence. It is undisputed that this rule serves several legitimate interests in the criminal trial process, and thus, it is neither arbitrary nor disproportionate in promoting these ends. The application of ER 404(b) did not prevent Petitioner from presenting a complete defense.

### B.  Evidence of Marmalejo's ownership of blue truck

Petitioner argued that his right to present a complete defense was denied by the trial court's refusal to permit Emanuel Reyes' testimony that Ramon Marmelejo owned a blue truck. He argues this evidence supported his theory that this truck was used as the getaway vehicle. Apparently, when the officers responded to the 911 call at the apartment complex where the murders and robbery took place, they observed a blue pickup leaving with two Hispanic males inside. They did not investigate further because it was an apartment parking lot and the blue pickup reportedly involved in the crime had already left the scene.

Reyes, who was Marmelejo's cousin, was going to testify that Marmelejo lived at a certain address two or three years earlier, and a blue pickup presently at that address had been there and was operable two to three years earlier. Petitioner believed this information, along with the fact that the police saw another blue truck

at the crime scene and other testimony that placed Orozco and Marmelejo at the Ninth Street house on February 20, was needed to present a complete defense.

The trial court held that Petitioner relied on speculation to show that Marmelejo had access to the blue pickup, had ever driven it, or that he had driven it on February 20, 2018. The Washington Court of Appeals concluded the trial court did not abuse its discretion in prohibiting Reyes from testifying, given that Petitioner had not established or offered "a train of relevant circumstances pointing to Marmelejo as a suspect who drove a blue pickup on February 20, 2005." ECF No. 15, Ex. 2, at 47.

The Washington Court of Appeals' determination that it was not improper to prohibit Reyes from testifying was not contrary to, or an unreasonable application of federal law. *See Holmes*, 547 U.S. at 326 (noting that "[w]ell-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. . . the Constitution permits judges 'to exclude evidence that is repetitive . . ., only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues.'") (citations omitted).

### C. Missing Witness Instruction

Petitioner argues the trial court should have issued a missing witness instruction regarding Ramon Marmelejo.

A missing-witness instruction informs the jury that it can presume an unproduced witness would have testified unfavorably to the party failing to produce the witness. *United States v. Leal-Del Carmen*, 697 F.3d 964 (9th Cir. 2012). There are two requirements for a missing-witness instruction: (1) the party seeking the instruction must show that the witness is peculiarly within the power of the other party; and (2) under the circumstances, "an inference of unfavorable testimony from an absent witness is a natural and reasonable one." *Id.*

It is not clear whether Petitioner presented this claim before the Washington

courts. Regardless, for the reasons stated above, Petitioner has not shown there is a reasonable inference that Mr. Marmalejo's testimony would have been unfavorable and therefore, a missing witness instruction was not required.

In sum, the Washington Court of Appeals' determination that Petitioner was not denied an opportunity to present a complete defense is not contrary to, or an unreasonable application of, established federal law. As such, Claim 9 is denied.

### (5)  Evidentiary Errors (Claims 10 and 11)

"[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules." *Marshall v. Lonberger*, 459 U.S. 422, 438, n.6 (1983). Thus, the failure to comply with the state's rules of evidence is neither a necessary nor a sufficient basis for granting habeas relief. *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991). A federal habeas corpus petitioner is entitled to relief from a state evidentiary error only if the alleged error was so grossly prejudicial that it fatally infected the trial and denied the petitioner fundamental fairness. *Id.*

In **Claim 10**, Petitioner argues the trial court erred in admitting evidence of the nine millimeter handgun and in **Claim 11**, he argues the trial court erred in admitting evidence of his post-arrest conduct.

As set forth above, Petitioner moved to exclude evidence of a 9mm handgun that was discovered under the passenger seat of the car where Petitioner was sitting at the time of his arrest. While the trial court denied the motion, the Washington Court of Appeals concluded that even if the trial court abused his discretion in admitting evidence of the 9mm, such admission was harmless because evidence of Petitioner's ownership of the guns was presented through the testimony of three witnesses. ECF No. 15, Ex. 2 at 43.

After Petitioner was arrested, he was captured by a surveillance camera attempting to pull money from his pockets and eat it while being held in a jail holding cell. The money was tested, but no match to the victim's blood or DNA

was detected.

The Washington Court of Appeals held this evidence was admissible as the jury could reasonably infer the unusual act of eating money was for the purpose of destroying evidence that might be linked to the murder scene and therefore infer that it was evidence of consciousness of guilt. ECF No. 15, Ex. 2, at 44.

Even if the trial court erred in admitting this evidence, it is not basis for habeas relief. Petitioner has not shown that the alleged errors were so grossly prejudicial that they fatally infected the trial and denied him fundamental fairness. Claim 10 and 11 are denied.

**(6)	Conclusion**

Petitioner has failed to show that he is in custody in violation of the Constitution of the United States. As such, his habeas petition is denied.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

Accordingly, **IT IS HEREBY ORDERED**:

1. Petitioner's Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus By a Person in State Custody, ECF No. 1, is **DENIED**.

2. The District Court Executive is directed to enter judgment in favor of Respondent and against Petitioner.

3. For the reasons set forth above, this Court certifies that any appeal from this Order would not be taken in good faith. See 28 U.S.C. § 1915(a)(3); Fed. R. App. P. 24(a)(3)(A).

**IT IS SO ORDERED.** The Clerk of Court is directed to enter this Order and provide a copy to Petitioner and counsel.

**DATED** this 26th day of September 2018.



Stanley A. Bastian
United States District Judge